UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America

    v.

Aamir Wahab *et al.*,

        Defendants.

**S7 21 Cr. 603 (VEC)**

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANTS' PRETRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ryan B. Finkel
Daniel G. Nessim
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 2

   I. The Plan .............................................................................................................................. 2

   II. The Fraudulent Scheme ...................................................................................................... 7

   III. Procedural History ............................................................................................................ 10

ARGUMENT ............................................................................................................................ 11

   I. The Defendants' Motions to Dismiss the Indictment Should Be Denied ........................... 11

     A. Applicable Law .............................................................................................................. 12

     B. Discussion ...................................................................................................................... 13

       1. The Indictment Properly Tracks the Statutory Language,
       Which Alone Is Sufficient to Deny the Motions ............................................................. 13

       2. The Four Corners of the Indictment Provide Sufficient Facts to Deny the Motion ..... 15

       3. The Indictment Properly Charges a Fraud Crime that
       Involved the Property of Another ................................................................................... 17

       4. The Health Care Fraud Object of Count One Does Not Require
       Intent to Obtain the Property of Another ....................................................................... 22

       5. The Plan Is a Health Care Benefit Program ................................................................. 24

       6. The Charged Conspiracies Are Not Duplicitous ......................................................... 27

   II. The Defendants' Motion for a Bill of Particulars Should Be Denied ................................. 33

     A. Applicable Law .............................................................................................................. 33

     B. Discussion ...................................................................................................................... 36

       1. Identification of All Uncharged Co-Conspirators Is Not Required ............................. 37

       2. Identification of All False Communications Is Not Required ...................................... 39

       3. Particularizing Alleged Victims and Property Interests Is Not Required .................... 41

   III. The Government Is in Compliance with Its *Brady* Obligations ........................................ 42

   IV. The Defendants' Motion for Grand Jury Material Should Be Denied .............................. 44

CONCLUSION ......................................................................................................................... 46

## TABLE OF AUTHORITIES

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1952) ............................................. 13

*Cleveland v. United States*, 531 U.S. 12 (2000) .......................................................... 22

*Ellis Nat'l Bank of Jacksonville v. Irving Tr. Co.*, 786 F.2d 466 (2d Cir. 1986) ...................... 19

*Guidry v. Sheet Metal Workers Nat'l Pens. Fund*, 493 U.S. 365 (1990) .................................... 19

*Hamling v. United States*, 418 U.S. 87 (1974) ............................................................ 12

*Jones v. United States*, 526 U.S. 227 (1999) ............................................................. 12

*Loughrin v. United States*, 573 U.S. 351 (2014) ..................................................... 23, 24

*Russell v. United States*, 369 U.S. 749 (1962) ........................................................... 12

*Shaw v. United States*, 580 U.S. 63 (2016) .......................................................... 23, 24

*United States v. Alfonso*, 143 U.S. 772 ........................................................ 13, 15, 17

*United States v. Anderson*, 980 F.3d 423 (5th Cir. 2020) ................................................. 25

*United States v. Barringer*, 481 F. Supp. 3d 596 (W.D. Va. 2020) ......................................... 21

*United States v. Berger*, 224 F.3d 107 (2d Cir. 2000) .................................................... 29

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ................................................ 34

*United States v. Bonventre*, No. 10 Cr. 228 (LTS),
2013 WL 2303726 (S.D.N.Y. May 22, 2013) ................................................................... 39

*United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016) .................................................. 23

*United States v. Brown*, No. 95 CR. 168 (AGS),
1995 WL 387698 (S.D.N.Y. June 30, 1996) ................................................................... 46

*United States v. Cephas*, 937 F.2d 816 (2d Cir. 1991) .................................................... 35

*United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004) ................................................ 32

*United States v. Cimino*, 31 F.R.D. 277 (S.D.N.Y. 1962) .................................................. 35

*United States v. Collins*, 74 F.3d 256 (5th Cir. 2015) ................................................... 25

*United States v. Conley,* No. 00 Cr. 0816 (DAB),
2002 WL 252766 (S.D.N.Y. Feb. 21, 2002) ................................................................... 35

*United States v. Cook*, No. 13 Cr. 777 (AJN),
    2014 U.S. Dist. LEXIS 182268 (S.D.N.Y. Mar. 10, 2014) ...................................... 37

*United States v. DeLillo,* 41 F. Supp. 1012 (E.D.N.Y. 1976) ...................................... 20

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ...................................... 35

*United States v. Frost*, 355 F. App'x 230 (10th Cir. 2009) ...................................... 25

*United States v. Goff*, No. 15-CR-616 (KBF),
    2016 WL 3264129 (S.D.N.Y. June 13, 2016) ...................................... 45

*United States v. Gotti*, 459 F.2d 296 (2d Cir. 2006) ...................................... 26

*United States v. Gottlieb*, 493 F.2d 987 (2d Cir. 1974) ...................................... 34

*United States v. Heinemann*, 801 F.2d 86 (2d Cir. 1986) ...................................... 28

*United States v. Jones*, 652 F. Supp. 1561 (S.D.N.Y. 1986) ...................................... 29

*United States v. Kazarian*, No. 10 Cr. 895 (PGG),
    2012 WL 1810214 (S.D.N.Y. May 18, 2012) ...................................... 34

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) ...................................... 13, 16

*United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) ...................................... 23

*United States v. Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) ...................................... 36

*United States v. Leslie*, 103 F.3d 1093 (2d Cir. 1997) ...................................... 26

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994) ...................................... 44

*United States v. Levy*, 11 Cr. 62 (PAC),
    2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ...................................... 40

*United States v. Lloyd*, 947 F. Supp. 2d 259 (E.D.N.Y. 2013) ...................................... 29

*United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003) ...................................... 25

*United States v. Mahabub*, No. 13 Cr. 908,
    2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ...................................... 35, 40

*United States v. Mahaffy*, 446 F. Supp. 2d 115 (E.D.N.Y. 2006) ...................................... 37

*United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) ...................................... 33-34

*United States v. Mechanik,* 475 U.S. 66 (1986) ...................................... 44

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ...................................................... 36

*United States v. Monserrate*, No. 10 Cr. 965 (CM),
2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011) .......................................................... 34

*United States v. Morales*, 280 F. Supp. 2d 262 (S.D.N.Y. 2003) .................................................... 34

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................................ 37, 39

*United States v. Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996) ...................................................... 35

*United States v. Nejad*, No. 18-CR-224 (AJN),
2020 WL 883500 (S.D.N.Y. Feb. 24, 2020) ...................................................... 24

*United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516 (S.D.N.Y. 2007) .................................... 44

*United States v. Pasquantino*, 544 U.S. 349 (2005) ................................................................. 22

*United States v. Patel*, No. 1:21-cr-12,
2022 WL 110842 (S.D. Ohio Jan. 12, 2022) ...................................................... 21

*United States v. Persico*, 621 F. Supp. 842 (S.D.N.Y. 1985) .................................................... 35

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) .................................................................. 12

*United States v. Post*, No. 08 Cr. 243 (KMK),
2013 WL 2934229 (S.D.N.Y. June 3, 2013) .................................................. 12, 13

*United States v. Proctor & Gamble Co.,* 356 U.S. 677 (1958) .................................................. 44

*United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) .................................................. 44, 45

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) .................................................. 36

*United States v. Rooney*, 866 F.2d 28 (2d Cir. 1989) .......................................................... 27, 28

*United States v. Samsonov*, No. 07 Cr. 1198 (CM),
2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) .................................................. 34, 35

*United States v. Sezanayev*, No. 17 Cr. 262 (LGS),
2018 WL 2324077 (S.D.N.Y. May 22, 2018) ................................................ 43, 44

*United States v. Sindone*, 01 Cr. 517,
2002 WL 48604 (S.D.N.Y. Jan. 14, 2002) .................................................. 35-36

*United States v. Skelos*, No. 15 Cr. 317 (KMW),
2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ...................................................... 13

*United States v. Soliman*, No. 06 Cr. 236A,
2008 WL 2690281 (W.D.N.Y. July 1, 2008) ........................................................ 22

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir.1992) ........................................ 13

*United States v. Stein*, 429 F. Supp. 2d 633 (S.D.N.Y. 2006) .................................... 45

*United States v. Strawberry*, 892 F. Supp. 519 (S.D.N.Y. 1995) ............................... 34

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ........................................... 12

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001) ..................................... 27, 33

*United States v. Sureff*, 15 F.3d 375 (2d Cir. 1989) ........................................... 28, 29

*United States v. Szur*, No. S5 97 CR 108 (JGK),
1998 WL 132942 (S.D.N.Y. Mar. 20, 1998) ...................................................... 32

*United States v. Taggert*, No. 09 Cr. 984 (BSJ),
2010 WL 532530 (S.D.N.Y. Feb. 11, 2010) ................................................. 29, 31

*United States v. Taylor*, 707 F. Supp. 696 (S.D.N.Y. 1989) ...................................... 35

*United States v. Thompson*, No. 13 Cr. 378 (AJN),
2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) .................................................. 12, 13

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) ............................... 33, 35, 37, 44

*United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK),
2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) ...................................................... 34

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) .............................. 35, 37

*United States v. Trochelmann*, No. 98 CR. 1276,
1999 WL 294992 (S.D.N.Y. May 11, 1999) ...................................................... 46

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ............................ 28, 29

*United States v. Vanwort*, 887 F.2d 375 (2d Cir. 1989) ........................................... 28

*United States v. Venturella*, 391 F.3d 120 (2d Cir. 2004) .................................... 26, 27

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ........................................... 12, 27

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ........................................... 12

## PRELIMINARY STATEMENT

Moving defendants Anthony Allen, Desiree Allen, Shannon Brown, William Bynum, Ronald Glen Davis, Darius Miles, Sebastian Telfair, and Sophia Chavez [1] are charged in Indictment S7 21 Cr. 603 (VEC) (the "Indictment") with conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. §§ 1349, 1343, and 1347 (Count One), and conspiracy to make false statements relating to health care matters, in violation of 18 U.S.C. §§ 371 and 1035 (Count Two). The charges arise from the moving defendants' participation in a conspiracy to defraud the National Basketball Association ("NBA") Players' Health and Welfare Benefit Plan (the "Plan"), by submitting fraudulent claims for reimbursement relating to medical expenses that were not actually incurred.

Defendants Miles, Anthony Allen, Brown, Bynum, Davis, Telfair, and Chavez move to dismiss the Indictment, asserting that Count One fails to allege that the defendants sought to obtain property of another; the Plan fails to satisfy the statutory definition of a "health care benefit program"; and the charged conspiracies are impermissibly duplicitous. (Dkt. No. 547 (the "MTD Memorandum" and "MTD Mem.").) Those defendants also move for a bill of particulars, for the production of purported *Brady* and *Giglio* material, and to review grand jury minutes. (Dkt. No. 550 (the "BOP Memorandum" and "BOP Mem.").) In addition, defendant Anthony Allen moves to dismiss the Indictment in his own motion, making similar arguments to the MTD Memorandum concerning obtaining property of another and whether the Plan constitutes a health care benefit program. (Dkt. No. 544 (the "Allen Memorandum" and "Allen Mem.").) Finally, Desiree Allen

---

[1] Anthony Allen, Desiree Allen, Shannon Brown, William Bynum, Ronald Glen Davis, and Darius Miles are referred to collectively as the "Player Defendants."

1

filed a letter joining in Anthony Allen's motion to dismiss the indictment. (Dkt. No. 545.) For the reasons set forth below, the defendants' motions should be denied in their entirety.

## FACTUAL BACKGROUND

### I.  The Plan

A.  <u>Plan Structure</u>

As set forth in the Indictment and as the Government expects will be established at trial, the Plan is a tax-exempt entity that provides certain benefits to eligible current and former NBA players, their spouses, and their qualifying dependents. (Ind. ¶ 7.) The Plan is managed by Trustees and has no employees. The Plan hires third-party administrators ("Administrative Manager")[2] to administer Plan benefits. (Ind. ¶ 9.)

One benefit the Plan provides is a health reimbursement account ("HRA"). (Ind. ¶ 7.) The HRA component of the Plan was created in a Collective Bargaining Agreement ("CBA") between the NBA and the NBA Players Association ("NBPA"). The Plan's HRA benefit was established in 2004, although it had some retroactive application.

Over a series of CBAs, NBA teams agreed to expand benefits for NBA players. Some of these benefits, including the HRA benefit, were funded using basketball revenue. This portion of basketball revenue funded the various enumerated benefits in a "waterfall" provision, with earlier CBAs establishing the HRA benefit as the lowest level of the waterfall. Meaning, after the other enumerated benefits were funded, the remaining corpus of promised basketball revenue would be deposited in the Plan, where administrative costs were withdrawn and with the share of HRA-

---

[2] During the time period of the scheme described herein, the Plan employed two different entities to serve as the Administrative Manager at different times. (Ind. ¶ 10.) For simplicity, both entities are identified herein as the "Administrative Manager."

claim funds then-participants could draw on increasing commensurately. The Plan's administrative costs include investment-management fees. The percentage of basketball revenue devoted to funding the benefits was not taken from player salaries; although, as described below, it does impact the salary cap.

Since the Plan's creation, additional CBAs have been agreed to, in 2011 and 2017. The 2017 CBA established a regular health insurance benefit for retired NBA players. Previously, former players were not provided league funded health insurance and thus, for many, the HRA served to cover a majority of medical services. With league funded health insurance in place for former players, the need for a large HRA benefit diminished. As a result, a side-letter, which was later incorporated into the CBA, capped the amount of reimbursements Plan participants could seek from the HRA benefit. Under this agreement, the amount of HRA reimbursement players could claim increased by $30,000 per each NBA season played but was capped at a career total of $150,000. This $150,000 cap did not apply retroactively against Plan participants subject to earlier CBAs. The Plan's HRA benefit also involves a concept of forfeiture, which involves certain situations where players lose the ability to seek reimbursements from the Plan. The 2017 CBA also established that the amounts associated with participants who had forfeited their ability to obtain reimbursements was to be used to offset the influx of new funds each year that would otherwise be coming from the NBA teams' basketball revenue.

The money NBA teams use to fund benefits, including the HRA benefits, comes from the players' 50 percent share of basketball related income (profit). The amount left from this share once benefits are accounted for is used to set the salary cap, which NBA teams use to determine the amounts they can chose to pay their players. The amount each player is paid is individually negotiated by the player and the team though the CBA sets certain rules such as the maximum

3

compensation a player can earn each year, and the minimum salary for an NBA player. Payments players receive from the NBA teams are guaranteed separately from any funds the team divert to fund benefits, including the Plan. Access to the Plan, including the HRA, is a fringe benefit provided to players who do not pay for these benefits with their individual salaries.

In order to be eligible to draw upon Plan HRA benefits, players must have played in the NBA for at least three seasons. Players who do not satisfy this condition forfeit their claim to any Plan monies.[3] In addition, Plan Participants forfeit their claim to Plan HRA funds if they die and have no dependents, or their dependents lose their eligibility,[4] or the dependents die as well. In such cases, forfeited funds are used to (i) offset payments that would otherwise be made by NBA teams; (ii) pay for Plan expenses; and/or (iii) distributed among Plan participants on a *pro rata* basis.

The Plan pays out funds for eligible medical expenses in two ways: First, participants can submit reimbursement claims for healthcare expenses that have already been rendered. Such a request requires plan participants provide information about the services rendered (e.g., type of service provided, the date, name of the participant or dependent for whom the service was provided, and the cost). (Ind. ¶ 11.) A participant must also certify that the information the Plan Participant entered in the Claim Form is accurate. The Claim Form states that "fraud is a felony in most states punishable by fines and/or imprisonment. Providing misleading or false information

---

[3] For an example, if an individual plays in the NBA for two years they would be accruing the ability to seek $60,000 in HRA reimbursement requests from the Plan ($30,000 per year of service). But if that individual does not play for a third year, the $60,000 upon which they could otherwise submit claims is forfeit.

[4] For example, if a child ages out of their dependent status.

constitutes fraud." (Ind. ¶ 11.) If approved, the Administrative Manager writes the participant a check or pays by direct deposit to reimburse the expense. (Ind. ¶¶ 11, 12.) Second, participants can obtain debit cards that are linked to the Plan's checking account, which can directly pay providers for healthcare expenses. (Ind. ¶ 13.) Typically, debit cards are used for smaller dollar expenses such as over the counter medication at a drug store or co-payments for a doctor visit. High dollar reimbursement claims typically require a claim reimbursement form.

Although participants in the HRA each have a fixed amount of funds upon which they can draw to pay for qualifying HRA claims, the Plan's assets, which includes the money used to pay claims, are managed collectively. The Plan invests its funds and redistributes investment gains and losses across the Plan participants on a *pro rata* basis. Although bookkeeping entries record participants' notional accounts, there is actually no individual account established for each player; these notional accounts are simply a way to keep track of the maximum amount a participant can claim in proper HRA expenses. If every Plan participant submitted proper claims for the maximum amount of HRA reimbursement for which they are eligible, the Plan would not have enough cash on hand to pay every claim, requiring an influx of cash from the NBA (which it has guaranteed to provide under governing agreements). In addition to investment accounts where most Plan funds are stored, the Plan has operating accounts, which are funded on a regular basis from the Plan's investment accounts to account for anticipated near-term expenses, including HRA claims.[5]

---

[5] In fact, as further described below, an influx of high-dollar reimbursement requests caused by the defendants in this case resulted in the operational accounts temporarily reaching a negative balance.

B. <u>Plan Regulatory Compliance</u>

The Plan's HRA benefits are structured to comply with the Employee Retirement Income Security Act of 1974 ("ERISA") and tax law and regulations. Under ERISA, plan participants are provided certain protections and rights. ERISA also imposes standards of conduct on those responsible for managing the Plan.

As for tax law and regulations, as long as HRA plans only reimburse for "medical care," as defined in 26 U.S.C. § 213(d), HRA benefits are tax-free to the employee. *See* 26 U.S.C. §§ 105, 106; *see also generally* Internal Revenue Service ("IRS") Notice 2002-45, *available at* https://www.irs.gov/pub/irs-drop/n-02-45.pdf ("IRS Notice 2002-45"). Consistent with the requirements of the Internal Revenue Code ("IRC"), the Plan is funded entirely by the employer—the NBA and NBA teams. These employer contributions are given preferential tax treatment to the employer (and not counted as income to the employee), and disbursements from the Plan to beneficiaries for qualified medical expenses are tax-free. 26 U.S.C. §§ 105(b), 152; IRS Notice 2002-4, at 4.  This is a substantial financial benefit for both the employer and employee. But that benefit is not permitted to be connected to a salary reduction. IRS Notice 2002-45, at 5 ("Employer contributions to an HRA may not be attributable to a salary reduction."). The Plan's payments are tax free when provided to current and former employees, their spouses and dependents, and the spouses and dependents of deceased employees.

To remain compliant with the IRC, HRA reimbursements must be for medical expenses; they cannot be for "cash or any other taxable or non-taxable benefit." IRS Notice 2002-45, at 3.[6]

---

[6] What qualifies as a medical expense is defined by statute, *see* 26 U.S.C. § 213(d), and elucidated through IRS rule making. For example, paying for a root canal is a medical expense but obtaining veneers is not.

If the Plan allows for a pattern of improper reimbursements, "*all* distributions to *all* persons made from the arrangement in the current tax year are included in gross income, even amounts paid to reimburse medical care expenses." *Id.* (emphasis added). In such cases the HRA would not provide tax free reimbursements and the Plan's benefit would lose its salience. Where an HRA plan makes a payment that does not correlate to an authorized medical expense, the Internal Revenue Service ("IRS") has established procedures to remedy the improper distribution to retain compliance. *See* IRS Notice 2003-43, at 3, *available at* https://www.irs.gov/pub/irs-drop/rr-03-43.pdf.

In light of these tax law rules and principles and the Plan's structure, participants have no future or *current* right to Plan funds. Plan funds do not belong to any individual Plan participants. The money can only be paid to reimburse eligible medical expenses. As described above, player and retired player participants, their spouses, their qualifying dependents, and the spouses of deceased participants are eligible to submit claims for the HRA benefit. In addition, Qualified Medical Child Support Orders ("QMCSO") have been issued to the Plan to compel the payment of eligible benefits to a child of a participant. *See* 29 U.S.C. § 1169.

## II.  The Fraudulent Scheme

Terrence Williams, a former NBA player, orchestrated the scheme to defraud the Plan. (Ind. ¶ 2.) The scheme principally involved Williams acquiring fraudulent medical and dental invoices in the names of his co-conspirators, who were former NBA players or their spouses, including the Player Defendants. The Player Defendants then submitted the fraudulent invoices to the Plan (via its Administrative Manager). These invoices claimed the Player Defendants had received, and paid for, the services described in the invoices, some of which sought hundreds of thousands of dollars of reimbursements. But those claims were lies. Because the Player Defendants

made misrepresentations to the Plan, the Plan paid them at least approximately $2.5 million of the approximately $5 million in fraudulent claims the conspiracy sought. (Ind. ¶ 1.)

The scheme's success depended upon the continued recruitment of former NBA players who were willing to submit fraudulent claims. The scheme also required medical providers, or others, who could create false invoices to paper the fraudulent reimbursement claims. (Ind. ¶ 2.) As to the first category, former NBA players were approached by Williams, Alan Anderson, Keyon Dooling and, on some occasions, certain other Player Defendants. (*See id.*) Some individuals who were pitched on the scheme declined to participate but others were willing and agreed to join the conspiracy. Those that did were provided fraudulent invoices, which leads to the second category of conspiracy actors—those that created the fraudulent invoices.

Williams obtained the fraudulent invoices used in the scheme from four primary sources: (i) defendant Aamir Wahab, a dentist in California (or a member of his staff, including defendant Sophia Chavez); (ii) defendant William Washington, a wellness doctor in Washington; (iii) defendant Pat Khaziran, a chiropractor in California; and (iv) after Khaziran declined to continue participating in the scheme, Williams directed two co-conspirators (identified in the Indictment as CC-1 and CC-2) to create invoices that appeared to be from Khaziran's clinics. (*See* Ind. ¶ 3.) That Williams provided invoices to Player Defendants, which purported to relate to those Player Defendants' own medical expenses, is itself evidence of the claims' falsity.

In addition, the Government will establish that the Player Defendants named in the invoices were not located near Washington's, Wahab's or Khaziran's clinics on many of the dates of service listed. (*See e.g.,* Ind. ¶ 40.) Further, the invoices on their face demonstrate their falsity, including, for example, the unrealistic number of root canals they claimed to have received in a single day.

(Ind. ¶ 41.a. ("TELFAIR received endodontic therapy on five teeth on March 6, 2018, eight teeth on March 1, 2019, and four teeth on March 5, 2019.").)

After Williams sent co-conspirators, including the Player Defendants, the fake invoices, the Player Defendants prepared reimbursement claims, which contained false statements, and submitted them to the Plan's Administrative Manager.

In connection with the claims, Player Defendants were often required to prepare, and sign, a claim reimbursement form that delineated the total amount of reimbursement sought, the identity of the medical provider who provided the medical service(s), and the dates of the service(s). Claim reimbursement forms were signed by the Player Defendants[7] below language which read:

> I hereby certify that the above information is correct [and] I understand that fraud is a felony in most states punishable by fines and/or imprisonment. Providing misleading or false information constitutes fraud.

(Ind. 11.)

Attached to the claim forms were the fraudulent invoices that Terrence Williams provided them. Indeed, in most instances email evidence, obtained by the Government via search warrants, established that Williams provided the Player Defendants fraudulent invoices just days before the Player Defendants submitted those fraudulent invoices to the Plan. (*See* Ind. ¶ 38.)

Once submitted, the Administrative Manager reviewed the claim form, its supporting documentation (*i.e.* the fraudulent invoices) and, if approved, authorized payment(s) of Plan funds to the Player Defendant as reimbursement. On some occasions, the Administrative Manager sought additional information from the Player Defendants to assess whether their claims met the criteria

---

[7] With the exception of Desiree Allen who submitted a claim form signed by her husband, co-defendant Anthony Allen.

for reimbursement. (Ind. ¶¶ 31 – 33.) For example, on May 8, 2019, defendant Ronald Glen Davis provided the Administrative Manager a claim for Khaziran's office, which relied on fraudulent invoices created at the direction of Williams. (*Id*.) In response to a request from the Administrative Manager, on May 31, 2019, the Administrative Manager was provided a letter of medical necessity purportedly signed by Khaziran. That letter appears to have been created by Williams and was unusual in several respects. (Ind. ¶ 32.) It was not on letterhead, contained unusual formatting, and had grammatical errors. (Ind. ¶¶ 32.) That letter was insufficient to establish that Davis's May 8, 2019, claim was eligible for reimbursement.

Player Defendants were typically required to provide Williams a portion of their ill-gotten gains as a kickback but not all did. Williams would then, sometimes, further disperse the proceeds to Wahab or other co-conspirators. (*See* Ind. ¶¶ 6, 68.)

## III.  Procedural History

The initial Indictment, 21 Cr. 603 (VEC) was unsealed on October 7, 2021. Most of the defendants charged in the initial indictment were arrested that day including, as relevant to the pending motions, Desiree Allen, Shannon Brown, Darius Miles, Sebastian Telfair, William Bynum, and Ronald Glen Davis. Anthony Allen surrendered, and was arrested, on October 12, 2022. The Player Defendants were charged with a single count of conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. § 1349.

Superseding Indictment S3 21 Cr. 603 (VEC) was unsealed on April 27, 2020. That same day, as relevant to the pending motions, Aamir Wahab and William Washington were arrested. Wahab, Washington and the aforementioned Player Defendants were charged in that Superseding Indictment with conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. § 1349.

10

On May 27, 2020, defendant Sophia Chavez was arrested and charged in a standalone superseding indictment, S4 21 Cr. 603 (VEC), in Count One of conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. § 1349.

On August 31, 2022, Superseding Indictment S7 21 Cr. 603 (VEC) was unsealed. This Indictment charged the Player Defendants, Wahab, Washington and Chavez in two counts: Count One charged a conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. § 1349. Count Two charged a conspiracy to make false statements relating to health care matters, in violation of 18 U.S.C. § 371.

On September 23, 2022, the MTD Memorandum, BOP Memorandum, and Allen Memorandum were filed.[8]

## ARGUMENT

### I.  The Defendants' Motions to Dismiss the Indictment Should Be Denied

The defendants seek to dismiss the Indictment on multiple grounds, each of which lacks merit. As a threshold matter, the Indictment properly complies with Rules 7 and 12. It need do no more. To the extent that the defendant's motions raise factual issues, those should be resolved at trial. The Court's analysis can end here; however, the defendants are nevertheless wrong in every argument they make to dismiss the Indictment. The Indictment properly alleges an intent to obtain property from another (although such intent is not a required element of conspiracy to commit health care fraud). The Plan is a health care benefit plan, as defined by statute. And, finally, the Indictment's conspiracy counts are properly charged.

---

[8] Charges against Wahab and Washington remain pending but neither defendant has joined the instant motions.

A. <u>Applicable Law</u>

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones v. United States*, 526 U.S. 227, 232 (1999)); *Hamling v. United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)). "A defendant faces a 'high standard' in seeking to dismiss an indictment." *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *6 (S.D.N.Y. Dec. 3, 2013) (quoting *United States v. Post*, No. 08 Cr. 243 (KMK), 2013 WL 2934229, at *5 (S.D.N.Y. June 3, 2013)).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Rule 7(c) (alterations omitted)). To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted). Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, that heightened standard is limited to "very rare cases," such as those involving refusal to answer questions before Congress, in which "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)). Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second,

enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling*, 418 U.S. at117); *Yannotti*, 541 F.3d at 127.

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir.1998). Accordingly, "[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true." *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *2 (S.D.N.Y. Oct. 20, 2015) (citing *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16 (1952)). Indeed, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted).

Even in cases involving very bare-bones charges, courts will not dismiss the indictment absent a showing of prejudice. *Stringer*, 730 F.3d at 124. Where a defendant has been given sufficient notice of the charges against him the indictment should stand. *See, e.g., id.* at 124-25; *Yannotti*, 541 F.3d at 127; *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.1992).

B.   Discussion

   1.   *The Indictment Properly Tracks the Statutory Language, Which Alone Is Sufficient to Deny the Motions*

The defendants fall far short of establishing any pleading deficiency here, let alone meeting the "high standard" they face in seeking to dismiss the Indictment. *See Thompson*, 2013 WL 6246489, at *6 (quoting *Post*, 2013 WL 2934229, at *5). The Indictment properly alleges that the defendants conspired together and with others to commit wire and health care fraud; and to make false statements in connection with health care matters.

13

The Indictment specifies the time period of the conspiracies as between in or about 2017 and at least in or about 2021. (*E.g.*, Ind. ¶¶ 1, 69, 73). It goes on to allege that the objects of the fraud conspiracy charged in Count One were (1) to "execute and attempt to execute, a scheme or artifice to defraud a health care benefit program and to obtain by means of false or fraudulent pretenses, representations, and promises, money or property under the custody or control of a health care benefit program in connection with the delivery of and payment for health care benefits, items and services" and (2) "to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice." (Ind. ¶¶ 70, 71.) The Indictment further alleges that the object of the false statements conspiracy charged in Count Two was to "falsify, conceal, and cover up by a trick, scheme, and device a material fact, and make a materially false, fictitious, and fraudulent statement and representation and make and use a materially false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items, and services." (Ind. ¶ 74.)

These allegations track the language of Title 18, United States Code, Sections 371, 1035, 1343, 1347, and 1349. Moreover, the Indictment describes the alleged fraud and false statements scheme in considerable detail over many pages, explaining how the defendants defrauded the Plan and made false statements concerning health care services that were not actually rendered. Because the Indictment tracks the language of the relevant statutes and provides more than adequate notice regarding that nature of the charged offenses, the defendants' motions to dismiss should be denied. *See Stavroulakis*, 952 F.2d at 693 ("We have often stated that an indictment need do little more

14

than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (internal citation and quotation omitted)).

At most, the defendants' motions raise *factual* issues that cannot be adjudicated on a motion to dismiss, but rather must be resolved through a trial. In particular, they claim that there was not a scheme to obtain money from the Plan (MTD Mem. 13-24; Allen Mem. 6-10); they also claim that the Plan does not constitute a "health care benefit program." (MTD Mem. 24-29; Allen Mem. 11-15). These are issues of fact. *See Alfonso*, 143 F.3d at 777. As such, these issues are appropriately decided not by the Court as a matter of law based on contentions in a brief, but rather by the jury based on the evidence presented at trial. As the evidence at trial will prove beyond a reasonable doubt, none of the defendants' contentions have any merit.

### 2. The Four Corners of the Indictment Provide Sufficient Facts to Deny the Motion

A bare bones indictment that simply tracked the statutory language and provided the timeframe of the offense would warrant the Court's denial of the defendants' motions to dismiss. However, the thirty-seven page speaking Indictment here provides substantial factual allegations to defeat the defendants' motions.

First, the defendants assert that the Indictment fails to allege that the charged conspiracy had, as its object, an intent to obtain the property of another. (MTD Mem. 24-29; Allen Mem. 11-15.) They are wrong. The Indictment is full of allegations that the aim of Count One was to induce the Plan to fraudulently make payments of Plan funds and that the Plan made such payments. (*See, e.g.*, Ind. ¶¶ 3 (fake invoices provided to Plan in exchange for "proceeds from the Plan"); 23(a) (co-defendant Aamir Wahab charged Plan debit cards for services never provided); 24 (Plan approved claims and made payment of Plan funds); 25 (false invoices used to submit to Plan "and receive reimbursement" for medical expenses not actually rendered); 26 ($350,000 in payments

from Plan); 35 (payment of numerous claims from Plan); 36 (necessity of repayment by players to Plan of funds paid as a result of fraud); 46 (payment of Plan funds); 51 (same); 53 (same); 61 (Plan debit cards charged more than $400,000 on the basis of fraud); 64 ("The purpose of this letter was for the Plan to then pay the claims.").)

The explicit meaning, or at the very least the inference, of the multiple relevant allegations of the Indictment is that the money obtained under false pretenses belonged to the Plan. And, as the defendants concede, "an indictment 'must be read to include facts which are necessarily implied by the specific allegations made.'" (MTD Mem. 8. (quoting *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002)).) These allegations provide the defendants with adequate notice and ensure that they will be tried on the evidence presented to the grand jury. Nothing more is required at this stage.

Second, the Indictment alleges that the Plan is a "health care benefit program" within the meaning of the statutory definition. (Ind. ¶¶ 70, 74.) It also provides numerous examples of the Plan's payment for what were represented to be healthcare expenses. (Ind. ¶¶ 1 (payment of at least $2.5 million for purported medical expenses), 7 (Plan allows for reimbursement of medical expenses), 13 (Plan allows for debit cards to pay for medical expenses directly), 24 (Plan paid healthcare claims), 26 (same), 35 (same), 53 (same).)

And, third, the Indictment alleges a single conspiracy in each count. (Ind. ¶¶ 69, 73.) And the Indictment is also replete with allegations that the defendants worked together in furtherance of their common criminal goals. (*E.g.*, Ind. ¶¶ 1 (defendants engaged in common scheme to defraud Plan), 25 (recruitment of co-conspirators and payment of invoices), 32-33 (working together to obtain letters of medical necessity).)

   *3.   The Indictment Properly Charges a Fraud Crime that Involved the Property of Another*

Even if the Court seeks to address the specific issues raised by the defendants, which it need not for the reasons, set forth above, their arguments lack merit.

The defendants make a number of arguments for why the Plan does not actually possess the funds the defendants worked to steal through fraud. Although the Court need not and should not consider the extrinsic evidence presented by the defendants, *see, e.g.*, *Alfonso*, 143 F.3d at 776-77, and as described above, the Indictment does all that is required at this stage (and more), their arguments are easily dismissed on the defendants' own terms.

The defendants ignore that the Plan's Trust Agreement itself defines the money the defendants stole, which was part of the Plan Trust as the "assets" of the Plan. (MTD Mem., Ex. B ("Trust Agreement") § 1.16 ("'Trust' shall mean the entire trust assets of the NBA Players' Health and Welfare Benefit Trust . . . .").) These Plan assets are to provide "such health and welfare-related benefits . . . for Participants, their dependents, and Beneficiaries." (*Id.* § 2.1.) The Trust Agreement also provides that "Title to all the monies paid into and/or due and owing to the Trust shall be vested in and remain exclusively in the Trustees; outstanding withheld contributions constitute Plan assets." (*Id.* § 4.2.)  Indeed, the defendants' own brief cites language defining the funds in question as "the *Plan's assets*." (MTD Mem 15 (emphasis in original).) The Trust Agreement also authorizes the Plan to use its assets for administrative expenses and to invest those assets. (Trust Agreement §§ 5.2; 5.4.)

These Plan assets do not exist to establish individual accounts that belong to the Participants; they are only intended to provide authorized benefits. Participants do not have the right to "cash out" their claim to HRA reimbursement funds, and if they and their qualifying

dependents die without exhausting those funds, they are forfeit. By law, the Plan is *not funded by the participants*, but by the NBA teams.[9]

Meanwhile, the Plan has actual possession of the funds, which it invests and manages collectively, without the assent or approval of any individual Plan participants. Plan funds are used to defray administrative expenses and can offset otherwise required capital influxes from NBA teams. Claims to Plan funds that were forfeited can also be distributed to the benefit of other Plan participants, further showing how no individual player has a possessory interest—let alone ownership—in the Plan funds. Each participant merely has a right to seek eligible reimbursements up to an established threshold for medical services that they have actually received. Plan funds cannot be accessed by the participants at will or for any purpose other than what the Plan, ERISA, and tax law permit. Plainly, the Plan possesses and controls the funds—it is a victim of the defendants' fraudulent scheme.[10]

The defendants' arguments otherwise are unavailing.

---

[9] The defendants erroneously argue that, due to the CBA, the teams only funded the Plan due to the CBA as a form of compensation and that "the funds paid into the Plan belonged to the Player Defendants." (MTD Mem. 24 n.14.) By law, funds paid to an HRA plan cannot be used to directly offset salary. *See* IRS Notice 2002-45, at 5. And the amount of money teams are required to pay toward the HRA and other benefits come from basketball revenue available for the league as a whole.

[10] The defendants misrepresent the Government's disclosures, asserting that statements representing the personal opinion of former Plan counsel should be taken as the Plan's position. (MTD Mem. 20 n.8; Allen Mem. 10.) As the Government's disclosure made clear these statements were the former attorney's "personal opinions and not the position of the Plan." (Laroche Decl. Ex. 11, at 2.) To argue otherwise is disingenuous and should be rejected by the Court. To be sure the Plan has not presently taken a position—either way—merely on its status with respect to its view as a "victim." It need not do so for the Government to prevail at trial particularly given the facts described above.

First, they argue that ERISA requires the Plan to operate only in the benefit of the participants "guarantee[ing] the Player Defendants' specific and sole interests in the Plan assets." (MTD Mem. 15) But the citations they point to do not support their claim. Of course, under its terms and pursuant to law, the Plan is obligated to pay reimbursements on eligible health care expenses properly submitted by participants. But unless and until Plan participants seek payment for such eligible expenses, they have no interest in the Plan funds at all. Until such time as an eligible reimbursement request is paid, the funds belong to the Plan.

Second, defendants argue that the use of the term "vest" to refer to players who have a right to submit HRA claims to the Plan endows the participants with inalienable property rights. (MTD Mem. 15-16.) They are wrong on this score too. The defendants' citations, to Black's Law Dictionary and the 1896 case of *Pearsall v. Great North Railway Company*, do not control. The participants do not have an "immediate fixed right of present or future enjoyment" in the Plan funds. They simply have a contingent and qualified right to eligible reimbursements for actual healthcare expenses up to a certain figure.[11]

Third, the defendants argue that the Plan holds "bare title" in the Plan funds and does not have a property interest. (MTD Mem. 17-20.) This argument, too, is mistaken. Again, analogies to general principles of property and trusts and estates does not alter the economic reality of the Plan funds here. In the context of the Plan's HRA benefit, the beneficiaries have no property interest in

---

[11] The ERISA cases the defendants cite that purport to support a no-forfeiture rule for ERISA funds are inapposite, as both relate to pension plans, which have a distinct definition under ERISA and are subject to distinct laws and regulations. *See* 29 U.S.C. § 1002 (defining "employee welfare benefit plan" and "employee pension benefit plans"); *see also Guidry v. Sheet Metal Workers Nat'l Pens. Fund*, 493 U.S. 365, 369-77 (1990) (considering pension plan and applying ERISA provisions applicable only to pension plans); *Ellis Nat'l Bank of Jacksonville v. Irving Tr. Co.*, 786 F.2d 466, 470-71 (2d Cir. 1986) (same).

the funds; they will not inherit them, cannot obtain them at will, and cannot pledge them to others. Participants can only access Plan funds for limited purposes if certain specific conditions are satisfied. A conventional trust-beneficiary comparison is inapposite.

The defendants then cite a number of irrelevant cases that shed no light on the present situation. In *United States v. DeLillo*, the defendant was charged with embezzling from an employee benefit fund. 421 F. Supp. 1012, 1013 (E.D.N.Y. 1976). In that case, a pension fund had sold a plot of land to a company controlled by the defendant, Colonie, and the sale price was required to be paid, in part, through Colonie obtaining a $3.5 million mortgage, which Colonie was required to spend in certain enumerated ways. *Id.* However, contrary to the agreement, the defendant embezzled approximately $1.5 million of the funds Colonie obtained through the mortgage. *Id.* The district court dismissed the indictment, determining that the funds in question had not belonged to the pension fund and thus the defendant had not embezzled from the fund. *Id.* at 1014. In *DeLillo*, the Government had directed the Court to a related state court decision, in which a judge had found both the pension fund and Colonie to be statutory trustees of the mortgage funds (although the pension fund never had possession or control of the funds). *Id.* The district court expressed doubt toward the state court decision, but wrote in dicta that even assuming the pension fund had such a statutory trustee status, the fund had no "equitable or possessory interest" in the funds. *Id.* at 1014-15. *DeLillo* is irrelevant to the instant case and is driven by its unique facts. If anything, *DeLillo* supports the Governments position, as the district court in that case examined the realities of possession and control of the property in question, which in this case would establish the Plan as the entity possessing and controlling the assets the defendants fraudulently obtained.

Next, the defendants point to *United States v. Barringer*, where the district court granted a Rule 29 motion as to two wire fraud counts (of eight counts of conviction). In *Barringer*, the acquitted conduct related to the defendant's fraudulent representations to the provider of her 401(k), which allowed her to make withdrawals from her 401(k). 481 F. Supp. 3d 596, 602 (W.D. Va. 2020). The district court determined that the Government had not proven that an individual beyond the defendant had property rights in the 401(k). *Id.* at 603. Procedurally, this post-trial ruling is driven by the sufficiency of the evidence and highlights the inappropriateness of considering the defendants' motion at this juncture. *See, e.g.*, *United States v. Patel*, No. 1:21-cr-12, 2022 WL 110842, at * (S.D. Ohio Jan. 12, 2022) (declining to apply *Barringer* in a motion to dismiss the indictment, leaving determination of the issue for a jury).  Furthermore, on the merits, a 401(k) is materially different from the Plan at issue here. 401(k)s are commonly funded, at least in part, directly by the beneficiaries and exist to distribute retirement benefits to accountholders to be used upon retirement or upon termination of service. There are no limitations on how 401(k) holders can use the benefits they are distributed. Furthermore, holders of 401(k) plans can seek tax-free hardship distributions for immediate economic need, which Barringer fraudulently attempted. Holders can also bequeath their 401(k)s and make early withdrawals of their 401(k) funds, although they can suffer significant tax consequences. *See* https://www.irs.gov/retirement-plans/hardships-early-withdrawals-and-loans. Accordingly, given the holder of a 401(k) benefit has power and certainty of access and use of 401(k) held funds, and directly funded it, it is nothing

21

like the contingent and limited Plan at issue here.[12] Accordingly, none of these cases support the argument the defendants have made here and should be rejected.[13]

### 4. The Health Care Fraud Object of Count One Does Not Require Intent to Obtain the Property of Another

The defendants' fraud conspiracy intended to obtain the property of another—the Plan's money; however, such proof is not even required for conviction under the first object of Count One's fraud conspiracy—conspiracy to commit health care fraud.

As the defendants note, the health care fraud statute "is modeled after the bank fraud statute." (MTD Mem. 11 (quoting *United States v. Soliman*, No. 06 Cr. 236A, 2008 WL 2690281, at *4 (W.D.N.Y. July 1, 2008)).) Both statutes set forward two similar provisions establishing different methods of committing the crime. A bank fraud exists where a person "knowingly executes or attempts to execute, a scheme or artifice" either "(1) to defraud a financial institution; or (2) to obtain any of the moneys funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. Meanwhile a health care fraud exists where a person "knowingly and willfully executes, or attempts to execute, a scheme or artifice" either "(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent

---

[12] The defendants inexplicably also cite cases which deal with theories of property that are not grounded in actual money. *See United States v. Pasquantino*, 544 U.S. 349, 355-56 (2005) (property in question was right to collect taxes); *Cleveland v. United States*, 531 U.S. 12, 22 (2000) (property in question was video poker licenses). But the property in question here—the Plan's assets—is prototypical and conventional property. The Plan's possession of this property is a requisite "valuable entitlement."

[13] In a separate section, the defendants assert that the Plan's intangible interest in its assets are insufficient. (MTD Mem. 21-24.) The Government is not proceeding under such a theory.

pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347.

In the bank fraud statute, the first prong of Section 1344 requires the Government to prove that a defendant engaged in a deceptive course of conduct with "knowledge that [the defendant] would likely harm the bank's property interest," *Shaw v. United States*, 137 S. Ct. 462, 468 (2016), including deprivation of the bank's right to use the property, *id.* at 467. However, the second prong, Section 1344(2), requires the Government merely to prove "that the defendant intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" through false or fraudulent pretenses. *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016). Section 1344(2) does not require a showing that "a defendant intended to defraud a federally insured bank or other financial institution." *Loughrin v. United States*, 573 U.S. 351, 355, 356-57 (2014) ("nothing in the [Section 1344(2)] clause . . . demands that a defendant have a specific intent to deceive a bank"). Rather, the Government may prove a violation of 1344(2) by establishing that the defendant "acquire[d] (or attempt[ed] to acquire) bank property 'by means of' [a] misrepresentation." *Id.* at 362-63. In other words, the Government need only prove that "the defendant's false statement [was] the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Id.* at 363. Thus, unlike Section 1344(1), Section 1344(2) does not require proof that the defendant targeted the property of a bank. A defendant is guilty of Section 1344(2) if they seek to obtain property under a bank's "custody and control." *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019)).[14]

_____

[14] Nor does Section 1344(2) require proof that the "defendant's scheme created a risk of financial loss to the bank." *Loughrin*, 573 U.S. at 366 n.9; *see also Shaw v. United States*, 580 U.S. 63 (2016) (bank fraud statute "demands neither a showing of ultimate financial loss nor a showing of

The same reading applies to the second prong of Section 1347, which prohibits the use of false or fraudulent pretenses to obtain "money or property owned by, or under the custody of control of, any health care benefit program." 18 U.S.C. § 1347(2); *compare with* 18 U.S.C. § 1344(2) ("moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution"). This reading of Section 1347(2) involves straightforward textual analysis, in the exact same manner and reaching the exact same result as *Loughrin*. *See, e.g.*, *Loughrin*, 573 U.S. at 356 ("But the text of § 1344(2) precludes Loughrin's argument."). Thus, even if there was any merit to the defendants' argument that the property in question does not belong to the Plan (there is not), there is no reasonable basis to argue that the property was not under the Plan's custody or control and that the defendants obtained that property as a result of their misrepresentations. The health care fraud object of Count One thus risks no challenge from the defendant's arguments concerning intent to obtain the property of another.

### 5.  The Plan Is a Health Care Benefit Program

The defendants also argue that both counts of the Indictment must be dismissed because the Indictment fails to allege that the Plan is a "health care benefit program" as defined by statute. (MTD Mem. 24-29; Allen Mem. 11-115.) The Court should reject this contention.

As described above, the Indictment properly alleges that the Plan is a health care benefit program. (Ind. ¶¶ 70, 74.) This alone is sufficient to deny the defendant's motion at this procedural juncture.

---

intent to cause financial loss"); *United States v. Nejad*, No. 18-CR-224 (AJN), 2020 WL 883500, at *3 (S.D.N.Y. Feb. 24, 2020) (citing *Loughrin*, 573 U.S. at 355-57) (stating that Section 1444(2) does not require proof that defendants "intended to cause harm to the victim banks—or to anyone else, for that matter").

On the merits, however, the Plan is plainly a health care benefit program. Such a program is defined as "any public or private plan or contract, affecting commerce, under which any medical *benefit*, item, or service is provided to any individual, and includes any individual or entity who is providing a medical *benefit*, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b) (emphasis added).  The Plan provides the *benefit* of providing tax free reimbursement for eligible *medical expenses*. The defendants attempt to confuse this point, by characterizing the Plan as simply a reimbursing body, without providing direct payment to healthcare providers. Even if that were correct, and it is not, that does not mean the Plan is not providing a "medical *benefit*." Indeed, 18 U.S.C. § 24(b) states that the benefit can be provided to an "individual"—*i.e.* a Plan participant. Payments sent to medical providers are not required.

In any event, the defendants are wrong. As charged in the Indictment, and as it operated in reality, the Plan issued debit cards to participants, which allows health care providers to directly bill against the Plan's checking account. (Ind. ¶¶ 13, 23(a), 60, 61, 67.) This direct payment obviously meets the minimum requirement the defendants' own brief and cited cases lays out. (*See* MTD Mem. 25 (citing *United States v. Lucien*, 347 F.3d 45, 52 (2d Cir. 2003); *United States v. Anderson*, 980 F.3d 423, 428 (5th Cir. 2020); *United States v. Collins*, 74 F.3d 256, 260 (5th Cir. 2015); *United States v. Frost*, 355 F. App'x 230, 233 (10th Cir. 2009)).)

The defendants further argue that the Plan does not satisfy the statutory definition because it does not affect interstate commerce. The Government's burden on this factor is light. As the Second Circuit has held when interpreting similar language in the money laundering statute as informed by the Hobbs Act, the necessary effect on commerce, which is a jurisdictional element, is "de minimis" and "signals Congress's desire to exercise the full extent of its Commerce Clause

power. . . . Hence, the Government's burden is not heavy." *United States v. Leslie*, 103 F.3d 1093, 1100-01 (2d Cir. 1997); *see also United States v. Gotti*, 459 F.2d 296, 336 (2d Cir. 2006).

Again, such an argument is not ripe for a motion to dismiss the indictment. But, in any event, it is an odd argument since the Indictment itself alleges the Plan's direct payment of medical expenses, through the use of debit cards, for medical providers and co-defendants Aamir Wahab and William Washington, who were located in two states, California and Washington. (Ind. ¶¶ 17, 18, 23(a), 60, 61, 67.) Nothing more is required. The Government can imagine no scenario in which these direct transfers of funds from the Plan, which is based in New York State, to for-profit medical providers in multiple states and Plan participants located throughout the country, fails to affect interstate commerce.[15]

Finally, the defendants turn to questions of legislative purpose and the canon of lenity. Such issues are inapplicable here, where the statute is clear and the Plan falls within the statutory definition. *See, e.g.*, *United States v. Venturella*, 391 F.3d 120, 132 (2d Cir. 2004) ("rule of lenity . . . not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act." (quoting *Chapman v. United States*, 500 U.S. 453, 463 (1991)). Indeed, as the Second Circuit noted in *Lucien*, in holding that no-fault insurance plans were health care benefit programs, "[w]e recognize that this holding authorizes the application of the federal health care fraud statute to circumstances that are atypical of the health care fraud case law, which to date has concerned itself more exclusively within the medical community. Despite this factual twist, it is clear that

---

[15] The defendants cite the Supreme Court's first Affordable Care Act case, *National Federation of Independent Business v. Sebelius*, in support of their claim without explaining how the Supreme Court's holding concerning Congress's power to create an individual health insurance mandate under the Commerce Clause applies to whether a particular health care benefit program in existence affects interstate commerce for the purposes of Title 18. (MTD Mem. 27.)

defendants' conduct falls squarely within the unambiguous terms of the statute and therefore the statute applies in the circumstances presented by this case." *United States v. Lucien*, 347 F.3d 45, 52 (2d Cir. 2003). The Plan is certainly a better fit than the insurance regime at issue in *Lucien*.

### 6. *The Charged Conspiracies Are Not Duplicitous*

The defendants next argue that the conspiracy counts fail to allege a single conspiracy, in fact alleging multiple distinct conspiracies, prejudicing the defendants, and necessitating dismissal of Counts One and Two as duplicitous. (MTD Mem. 29-39.) The Court should also reject this argument.

An indictment will be impermissibly duplicitous where: "1) it combines two or more distinct crimes into one count in contravention of [Federal Rule of Criminal Procedure] 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby." *United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) (citation and internal quotation mark omitted). Duplicitous indictments can present three types of prejudice: (1) lack of notice of the crime charged and its maximum penalty; (2) the possibility that a second trial on the same charge would not be barred by the Double Jeopardy Clause, and (3) potential uncertainty with respect to the jury's verdict and the sentencing implications of that verdict. *See United States v. Sturdivant*, 244 F.3d 71, 77-78 (2d Cir. 2001).

"There is no requirement that each member of a conspiracy conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989) (internal citations omitted). Proof of a single conspiracy requires nothing more than evidence from which "'it reasonably could be inferred that [multiple defendants] participated in the alleged enterprise

with a consciousness of its general nature and extent.'" *Id.* (quoting *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980)).

Co-conspirators need not have agreed on the details of the conspiracy, so long as they have agreed on "the essential nature of the plan," nor must the goals of all the participants be congruent, so long as their goals are not at cross purposes. *See Maldonado Rivera*, 922 F.2d at 963; *see also United States v. Heinemann*, 801 F.2d 86, 92 n.1 (2d Cir. 1986). Nor is it required that the members of a conspiracy "conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member." *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989) (internal quotation marks omitted); *see also United States v. Sureff*, 15 F.3d at 230 (a single conspiracy "may encompass members who neither know one another's identities . . . , nor specifically know of one another's involvement").

"A 'single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more spheres or phases of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 553 (S.D.N.Y. 2014) (quoting *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004)). "The Government must show that each alleged member of the conspiracy agreed to participate 'in what he knew to be a collective venture directed toward a common goal.'" *Ulbricht*, 31 F. Supp. 3d at 553 (quoting *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008)).

"In a hub-and-spoke (or 'wheel') conspiracy, one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor." *Ulbricht*, 31 F. Supp. 3d at 554 (S.D.N.Y. 2014) (citing *Kotteakos v. United States*, 328 U.S. 750, 754-55 (1946)). In the context of a "wheel conspiracy," a single conspiracy requires some showing "that there was a 'rim' around the spokes, such that the 'spokes' became co-conspirators with each other." *United*

28

*States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014). A single conspiracy exists where co-defendants "were likely aware—or should have been aware—that they were involved in a broad project" for a common illegal goal. *United States v. Taggert*, No. 09 Cr. 984 (BSJ), 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010) (internal quotation marks omitted)

      a. <u>The Multiple Conspiracy Argument is Not Ripe</u>

First, as with the defendants' other claims for dismissal, their argument here fails procedurally because whether evidence proves "a single or multiple other independent conspiracies is a question of fact for a properly instructed jury." *Sureff*, 15 F.3d at 229. A defendant's "contention that the proof at trial may show multiple separate conspiracies rather than a single conspiracy alleged in the indictment is an argument properly made at the conclusion of the Government's case-in-chief, not in a pretrial motion." *United States v. Jones*, 652 F. Supp. 1561, 1565 (S.D.N.Y. 1986). At this stage, it is sufficient that the Indictment properly and adequately alleges a single conspiracy (Ind. ¶¶ 69-74) and the question of whether the Government has adequately proven the existence of the charged conspiracy is a factual question left to the jury, *see, e.g.*, *United States v. Lloyd*, 947 F. Supp. 2d 259, 265 (E.D.N.Y. 2013); *Ulbricht*, 31 F. Supp. 3d at 557 (setting forth considerations of conspiracy law that will be at issue at trial and stating that the Government need not address sufficiency of single conspiracy evidence at motion to dismiss stage). If the trial evidence supports it, the defendants will be free to request a multiple conspiracies instruction, making clear that the jury is required to find the existence of the charged conspiracy. *See, e.g. United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000) (holding evidence was sufficient to support trial conviction of single conspiracy where jury was adequately informed that if it found multiple conspiracies rather than the single charged conspiracy acquittal was required); *Sureff*, 15 F.3d at 229. The defendants' argument can be rejected on this basis alone.

b. <u>The Indictment Properly Charges a Single Conspiracy</u>

In any event, the Indictment properly charges a single conspiracy. In this conspiracy, the conspirators were joined by a common goal and purpose—to submit false statements concerning health care to the Plan and fraudulently obtain Plan funds to which they were not entitled. Unlike *Kotteakos*, which involved a single common participant, the conspiracy here was united by Williams, and others. Allan Anderson and Keyon Dooling, recruited other members to the conspiracy and the co-conspirators who created fraudulent invoices (Wahab, Washington, Khaziran, CC-1 and CC-2) and/or made fraudulent charges. (*E.g.* Ind. ¶¶ 2-5.) The conspiracy was further united by its common intended victim, the Plan. (*E.g.* Ind. ¶ 1.) And the Plan participant defendants were united by their common status and relationship as retired NBA players with the right to claim reimbursements from the Plan. (Ind. ¶¶ 14 - 22.) The very nature of the conspiracy, which required fraudulent documentation and multiple layers of participants, and which required the participation of co-conspirators who had the ability to submit claims to the Plan, made clear to the defendants the breadth of the crime. (*See e.g.* Ind. ¶¶ 23-25, 30, 33.)

Indeed, there are multiple pieces of evidence the Government expects will be established at trial showing the defendants' knowledge of the conspiracy's scope. For example, among other factors, when recruiting former players to join the conspiracy, Williams often cited his success working with other former players in obtaining illegal proceeds from the Plan. And after successfully defrauding the Plan, Williams told co-conspirators that if they recruited additional former players they would be entitled to a partial kickback of those newly recruited players

fraudulent proceeds.[16] Further, the co-conspirators were aware that the medical providers were conspirators and created invoices for the scheme. On other occasions, some Player Defendants had meetings and exchanged communications with other co-conspirators. (Ind. ¶ 39 ("On or about June 25, 2019, Anderson emailed Williams with updated referral letters dated June 25, 2019, purportedly from DOCTOR-2, for DAVIS, Watson Jr., and Wright").)[17] Not only was this information explicit to co-conspirators but they also "should have been aware—that they were involved in a broad project" for a common illegal goal given the nature of the scheme. *Taggert*, 2010 WL 532530. It defies reality for the Player Defendants to contend that they believed they, and they alone, were handpicked by Williams, and provided invoices from coconspirator doctors for a single fraudulent submission, and there were no other participants.

The defendants' arguments to the contrary are misplaced. For example, the fact that some fraudulent claims were approved while others were denied (MTD Mem. 33) does not undermine

---

[16] Indeed, text message evidence shows that Williams described the recruitment by former players of other players into the scheme as a "cycle." Specifically, on June 28, 2019, Williams sent a text message to Wahab explaining that Miles recruited others: "[a]nd miles brought two . . . I'm taxing [sic] that you didn't do the paperwork for, it's a cycle[.]" Notably, Miles made fraudulent submissions to the Plan in April and June 2019 just before Williams sent that message. Miles also communicated directly with Wahab. For example, on June 1, 2018, Wahab messaged Miles and stated "Hey darius, this is Dr wahab...keyons dentist. I just texted you the links to all 4 receipts. Let me know if you got them." The reference to "keyon" is plainly Keyon Dooling who also recruited former players into the scheme. These messages demonstrate co-conspirators awareness of the breadth of the scheme beyond their agreement with Williams.

[17] They also exchanged money. Putting the kickback payments to Williams to the side, in another example, on April 24, 2019, a Cash App account associated with Alan Anderson sent Telfair $5,000. Telfair had fraudulent claims approved by the Plan just weeks before on March 25, 2019, March 26, 2019, and April 1, 2019. The timing and amount of the transfer indicates it was related to the scheme and further evidences awareness by the Player Defendants of the scheme's common purpose as well as others in the scheme beyond Williams.

that there was a single conspiracy. Not every venture of a conspiracy is required to be successful.[18]

Obviously, the conspiracy's continued success required that the criminal scheme not be detected and, if it had not been, it would allow all conspirators to continue to claim fraudulent reimbursements up to their maximum threshold. But the fact that the conspiracy was ultimately detected does not nullify the fact that it is a common scheme.

The defendants assert that the Indictment fails to allege that the player defendants knew of each other's involvement (MTD Mem. 35-36), but this argument is irrelevant at this stage. *United States v. Szur*, No. S5 97 CR 108 (JGK), 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) ("since the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single or multiple conspiracies exist is a question for the jury and is not a basis to dismiss the conspiracy count"). The Indictment properly alleges a conspiracy, it need not set forth specific allegations of common knowledge. *See id.* (rejecting argument that conspiracy count required dismissal because it was a rimless wheel conspiracy because "the charging paragraph of the conspiracy count alleges that all of the defendants agreed and conspired together to commit the

_____

[18] The case of *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004) fails to support the defendants' position. *Chandler* involved more than 43 defendants charged in a fraud conspiracy involving the embezzlement and fraudulent redemption of McDonald's game stamps, in which only one person was common to the various participants. *See* 388 F.3d at 803-04. In *Chandler*, the various spokes had no knowledge of the underlying embezzlement and thus could not have knowingly joined a common conspiracy premised on that embezzlement. *See id.* at 808-09. This issue is irrelevant here where the evidence is clear that each defendant knowingly joined in the conspiracy to obtain and submit fraudulent medical expenses for payment and/or reimbursement. The scope of the scheme was known to the conspirators in a manner absent in *Chandler*. And *Chandler*, like *Kotteakos*, involved a single common participant among multiple conspiracies that had no other linkages to each other. *See Id.* at 808. Here the conspiracy was bound together by multiple layers of common participants, including facilitator defendants and medical-provider defendants; a common victim; the defendants' knowledge of the breadth to the agreement.

various acts alleged"). The contention is also mistaken. As described above, the Indictment is replete with allegations of knowledge among player defendants, from which can be inferred knowledge among the conspirators at large.

Even if the Indictment charged multiple conspiracies, which it does not, the defendants are not prejudiced by any duplicity. None of the factors identified in *Sturdivant* apply here. *See* 244 F.3d at 77-78. First, the Indictment provides each defendant of adequate notice of the charged crimes, in more than sufficient detail. Second, in the event of conviction, there will be no ambiguity as to the crime each defendant was convicted of for double jeopardy purposes. Finally, should the defendants establish a proper basis for instructing the jury on a single versus multiple conspiracy, there is no risk that the verdict conceals "a finding of guilty as to one crime and a finding of not guilty as to another." *Id.* at 78 (quoting *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981)).

## II.  The Defendants' Motion for a Bill of Particulars Should Be Denied

The defendants move for a number of particulars. Consistent with established law, the Indictment and discovery materials provide the defendants with more than enough factual information to adequately defend against the charges. The motion, which constitutes an improper demand for a preview of the Government's trial evidence and a method to cabin the Government's trial presentation, should be easily rejected.

### A.  Applicable Law

The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), abrogated on other grounds by *United States v. Marcus*,

628 F.3d 36, 41 (2d Cir. 2010); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234.

 If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," no bill of particulars is required. *Bortnovsky*, 820 F.2d at 574. In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also the discovery and other filings by the Government. *See, e.g.*, *United States v. Kazarian,* No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012) (noting the "enormous amount of discovery material" which "provide [the defendant] with much of the information sought in the request for a bill of particulars"); *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial).

In other words, the defense cannot use a bill of particulars as a general investigative tool, *United States v. Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003), or as a device to compel disclosure of the Government's evidence prior to trial. *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)); *see also United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995). Supplying evidentiary detail is not the function of the bill of particulars. *Torres*,

901 F.2d at 234. Accordingly, the Government is not required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, *see United States v. Muyet*, 945 F. Supp. 586, 598-599 (S.D.N.Y. 1996). The ultimate test is whether the information sought is *necessary*, not whether it is helpful. *See United States v. Conley*, No. 00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989); *United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985).

There are good reasons why bills of particulars are warranted only where the allegations in an indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. Because a bill of particulars "confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). "The [G]overnment's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise." *United States v. Mahabub*, No. 13 Cr. 908, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *see also Samsonov*, 2009 WL 176721, at *3 (bill of particulars "must not be misused . . . to foreclose the Government from using proof it may develop as the trial approaches").

Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197 (citing *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962)); *United States v. Sindone*, 01 Cr. 517, 2002 WL 48604, at *1 (S.D.N.

Jan. 14, 2002) ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present. Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.").

Applying these principles, courts in this district routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed or how the Government intends to prove its case at trial. *See, e.g.*, *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying request for bill of particulars identifying "each act of 'fraud, neglect, connivance, misconduct, and violation of law' upon which the Government will base its case," and noting that Government may not be compelled to disclose manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories); *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (rejecting request for bill of particulars regarding the names, dates and places for the entire case as "an attempt to discover the minutia of the Government's case").

B.   <u>Discussion</u>

The defendants do not need a bill of particulars to defend this case and are not entitled to one as a matter of law. Indeed, much of what the defendants seek amounts to a request for a presentation of the Government's proof, and much of it is already contained in the Government's disclosures, which the defendants have ample time to review. Rather, it appears the defendants are seeking particulars concerning four topics to improperly "lock the government into its proof," *United States v. Rigas*, 258 F. Supp. 2d 299, 304 (S.D.N.Y. 2003). That is not a proper purpose and, in short, the defendants' requests do not represent an appropriate use of Rule 7(f), and should therefore be denied.

36

*1.  Identification of All Uncharged Co-Conspirators Is Not Required*

The law in this Circuit generally does not require the Government to identify alleged co-conspirators as part of its Rule 16 discovery. *See Torres*, 901 F.2d at 233-34 (upholding district court's denial of a bill of particulars where the defendant had requested, in part, "the identity of those other persons 'known and unknown' as alleged in . . . the indictment"); *United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016) ("courts in this circuit frequently exercise their discretion to deny requests to identify co-conspirators through a bill of particulars") (citing *United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006)); *United States v. Cook*, No. 13 Cr. 777 (AJN), 2014 U.S. Dist. LEXIS 182268, at *15 (S.D.N.Y. Mar. 10, 2014) (denying motion for bill of particulars identifying other co-conspirators where "the co-conspirators are alleged to have worked directly with one another"); *Trippe*, 171 F. Supp. 2d at 240 ("[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."). That is particularly true where, as here, "the Government has provided discovery that will enable a defendant to adequately prepare his defense." *Murgio*, 209 F. Supp. 3d at 721-22; *see also Bortnovsky*, 820 F.2d at 574 ("Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required.").

Here, the materials provided to the defendants as part of the Government's discovery productions are more than sufficient to allow the defendants to identify the other co-conspirators in this scheme. *First*, with respect to CC-1 and CC-2, the Government produced email communications between CC-1 and Williams, as well as CC-2 and Williams. It should be relatively straightforward for the defendants to identify these messages particularly where the Indictment is explicit about the roles CC-1 and CC-2 played in the scheme. (*E.g.* Ind. ¶¶ 30 ("The

37

CHIROPRACTIC OFFICE-1 invoices fabricated by CC-1 and CC-2 for Williams"), 27 ("Between in or about November 2017 and December 2017, and again from in or about November 2018 to June 2019, at the direction of Williams, CC-1 created fake CHIROPRACTIC OFFICE-1 invoices for RUBEN PATTERSON, WILLIAM BYNUM, ANTHONY ALLEN, DARIUS MILES, SEBASTIAN TELFAIR, and SHANNON BROWN").)

Indeed, the Indictment even goes so far as to provide specific dates CC-1 and CC-2 sent messages to Williams or to themselves that were relevant to the scheme. (Ind. ¶¶ 27 ("For example, on or about May 28, 2019, CC-1 emailed Williams a template for a fraudulent invoice designed to appear as if it had been issued by CHIROPRACTIC OFFICE-1, when it was not."), 28 ("On or about May 3, 2019, CC-2 sent an email to CC-2's self that attached a template for a fake CHIROPRACTIC OFFICE-1 invoice that had the date, invoice number, services, and charge of $15,000 filled in; however, the "bill to" box, where the name of the patient would ordinarily be found, was blank").) Those communications, though appropriately protected by the protective order in this case, do not mask CC-1 and CC-2's identity from the defendants.

The Indictment also makes plain that CC-1 and CC-2 created invoices that appeared to be from Chiropractic Office-1, when they were not, which sufficiently enables the defendants to identify the messages relevant to the charged fraud scheme and CC-1 and CC-2's identities. Beyond the Indictment, the Government has produced search warrant affidavits that provide additional information about CC-1, CC-2, and their communications, including a search warrant affidavit that described probable cause associated with CC-1's email account.

The identities of other co-conspirators is also discernable in the Government's production, especially given other statements made by the Government. In just one example, on May 2, 2022, the Government filed a discovery status report with the Court. (Dkt. 243.)  In that report the

Government informed the Court it was searching materials obtained from the Administrative Manager "for the last names of the newly added defendants and certain other co-conspirators." (*Id.* at 2.) Those materials were subsequently produced and identified as "Documents from the [Administrative Manager]," to the defendants. The defendants can easily review the materials and identify individuals identified in them. And the defendants can review subpoena returns from a number of individuals, including CC-2 and medical providers, to discern identities of other co-conspirators.

At bottom, the Indictment describes a scheme that involved fraudulent invoices obtained from Wahab, Khaziran, Washington, CC-1 and CC-2, and the defense group is capable of assessing who else made submissions to the Plan using invoices from those sources.

### 2. *Identification of All False Communications Is Not Required*

As the defendants concede, the "Indictment has identified some communications involving some Defendants that [the Government] alleges were made in furtherance of the charged conspiracies." (BOP Mem., at 17.) No more is required. Indeed, numerous courts have found, where specific examples are offered, as were here, the Government need not produce a bill of particulars containing an inventory of every act it plans to prove that constituted part of the fraud. *See, e.g.*, *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *5-*7 (S.D.N.Y. May 22, 2013) (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, all "allegedly false records upon which the Government intends to rely to prove its case," "the specific entries [in specific books and records] that the Government alleges [the defendants] knew were false," "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," and "all unnamed clients and

39

allegedly fake trades referred to in" a particular count); *United States v. Levy*, 11 Cr. 62 (PAC), 2013 WL 664712, at \*4, 13 (S.D.N.Y. Feb. 25, 2013) (in case charging stock manipulation through false representations by corrupt brokers, request for bill of particulars recounting "each specific misrepresentation and omission alleged" denied as "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and quotation marks omitted).

Beyond the language in the Indictment, and putting aside search warrant affidavits which describe, with some specificity, the fraudulent acts undertaken by the defendants, the discovery provided to the defendants sufficiently identifies the false claims made by each of the defendants. In fact, as has been pointed out to many of the charged defendants' counsel,[19] within the Government's discovery are 18 subfolders each bearing the names of 18 defendants—including one folder for Brown, Bynum, Miles, Telfair, Anthony Allen, Desiree Allen and Davis—each of which contains fraudulent claim forms and supporting documentation of the sort described in the Indictment.[20] To be sure, the Government is not limited to those materials at trial and, indeed, there were other fraudulent communications made to the Plan in the form of phone calls and emails. Such materials are readily identifiable given the specific information the Government has provided in this matter. Requiring the Government to identify all such material now would limit its ability to prove its case at trial. *See Mahabub*, 2014 WL 4243657, at \*2.

_____

[19] Brown is simply wrong to suggest the Government has not provided "any real assistance." (BOP Mem., at 18.) Counsel for the Government has, in several instances, directed defense counsel to specific materials or otherwise provided them when asked. The Government is not required, however, to undertake a review of all discovery material for the defense and provide its view as to how each document is relevant in this matter.

[20] *See* USAO_00191459-0193625. (Anthony Allen and Desiree Allen share the same folder.)

Moreover, discovery is organized in a manner that enables each defendant to locate particular materials because defendants can use as aides the Government's detailed speaking indictments, search warrant affidavits, and other filings including discovery status reports. Further, though discovery may be voluminous, it is not impossible for the defense to perform text searches to locate materials such as emails between a particular defendant and the Administrative Manager or documents submitted to the Administrative Manager bearing a defendant's name.

### 3.  Particularizing Alleged Victims and Property Interests Is Not Required

The defendants further request that the Government "identify the alleged victim . . . the property interest they allegedly possess and any evidence supporting the same." (BOP Mem., at 9.) This is nothing more than trying to serve an interrogatory in a criminal case. In any event, as described *supra* I.B., this information has been provided. The Government identified those harmed by the defendants' scheme. Notably, under the Plan, the NBA teams required to fund it in the event of shortfalls, and other Plan participants who could suffer losses as result of the defendants' conduct—including the possibility that the Plan could lose its tax-exempt status.[21] A bill of particulars is unnecessary here because, as the MTD Memorandum and defendant Miles's earlier submission to this Court demonstrates, the defendants *are aware* of who the Government contends was harmed by the defendants' scheme. (*See* MTD Mem.; Letter from T. Trazskoma, dated Oct. 6, 2022 (Dkt. 586) (taking issue with the Government's assertions in a sentencing submission concerning the harm caused by the defendants' conduct); *see also* BOP Mem., at 10

---

[21] Ironically, the defense tries to score points by claiming that disclosures made by the Government conflict with the Government's theories regarding the victims of the defendants' scheme. (Brown Mot., at 11.) That a disclosure provided information inconsistent with the Government's theories is likely the reason why the Government made the disclosure. It is not a reason for a bill of particulars.

("Defendants understand the government view the Plan, at a minimum, as a victim of the crimes charged in the Indictment.").) Given defense counsel's own statements, it is overblown for the defendants to contend they "do not [have] adequate notice as to the alleged victims." (Brown Mot., at 10.)[22]

Accordingly, to the extent the defendants seek a Bill of Particulars regarding victim identification, and property interest, their motion should be denied.

## III.   The Government Is in Compliance with Its *Brady* Obligations

The defendants seek an order directing the Government to disclose all exculpatory material and produce complete notes concerning calls with Plan counsel who represent the Plan on June 29, 2020; December 16, 2021[23]; and January 19, 2022. The defendants also seek notes from a witness interview on September 7, 2022, with an attorney who counsels the Plan concerning its structure and regulatory compliance.

The Government recognizes, and takes seriously, its obligations under *Brady v. Maryland* and its progeny. The Government is also already subject to a Court Orders obligating it to comply

---

[22] The defendants also seek to require the Government to "identify the health reimbursement accounts" used by the defendants. (BOP Mem, at 13 (alterations omitted).) This request appears premised on the defendants' belief the Government may proceed under a right to control theory. Because the Government is not, this request may largely be moot. In any event, the contention that the defendants must "know[ ] the specific account or accounts from which" the defendants obtained property is unsupported by any legal precedent and the facts. The Government need not identify the bank accounts from which money was extracted. And, in any event, subpoena returns concerning the Plan's bank account information was produced. To the extent the defendants use the term "accounts" to refer to the notional accounts that Plan uses to track the maximum amount of reimbursement each participant may request, the implicated notional accounts are obvious given Indictment's allegations and other Government filings.

[23] The Government's disclosure erroneously identified this call as occurring on December 21, 2021.

with its disclosure obligations. (*E.g.* Dkt. No. 41.) To the extent that the Government has identified potential *Brady* material as to any defendant, the Government has disclosed such material. The Government has sent at least five disclosure letters all of which contain several discrete disclosures. While the Government is not presently aware of any *Brady* material beyond what has been disclosed and identified, should the Government become aware of any, it will promptly produce it or seek relief from the Court. Indeed, the Government has continued to review its files to ensure that it is in compliance with its obligations and that it produces materials consistent with any new theories asserted by the defense. *See, e.g.*, *United States v. Sezanayev*, No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *9 (S.D.N.Y. May 22, 2018) ("The Government's good faith representations of its continuing compliance with its *Brady* disclosure obligations is sufficient.").

In support for their motion, the defendants primarily point to particular prior disclosures as evidence the Government is not meeting its disclosure obligations. (BOP Mem., at 21-22.) They specifically reference the Government's disclosures containing statements made by Plan counsel as well as the Government's February 1, 2022 disclosure, which stated that the Plan informed the Government it takes "no position" as to whether it is a victim of the conduct charged in the Indictment. The defendants' argument here does not make sense. The defendants are citing *Government disclosures* as the reason why they have "concerns" that the Government is *not making disclosures*.

Moreover, the Government must note that the statements made by one of the Plan's former attorneys, which the defendants continually point to for any number of reasons, *do not reflect the Plan's position*. (Laroche Decl. Ex. 11, at 2.) That attorney's opinions were also internally inconsistent. In addition to the information the defendants continue to reiterate (*see e.g.* BOP Mem. at 6, 22-23; Allen Mem., at 3, 9-10), in the same disclosure, the Government produced the

43

attorney's opinion that the Plan *is* a victim of the defendants' conduct. *Id.* ("to the extent that a victim is someone who could suffer as an adverse effect, then the [Plan] is a victim").

With respect to the specific notes of calls and an interview the defendants seek be produced, the Government is not required to do so at this time. The Government has provided the defendants with the portions of notes that are subject to disclosure, and the defendants have the information they need to make use of that information well in advance of trial. Other topics discussed on the calls with Plan counsel or with a witness need not be produced now, months before trial.

### IV. The Defendants' Motion for Grand Jury Material Should Be Denied

Grand jury proceedings are presumed to be valid, *see United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring), and should presumptively remain secret, *see United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682 (1958). A court "may" authorize disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). However, "[t]o obtain disclosure of grand jury materials, a defendant must demonstrate a 'particularized need' for the materials." *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 519 (S.D.N.Y. 2007) (quoting *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978)). Courts in this Circuit have long held that "[a] review of grand jury minutes is rarely permitted without *specific* factual allegations of government misconduct." *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990) (emphasis added), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010); *see also United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct."); *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (noting that grand jury proceedings

are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.").

At the outset, the Government notes that it has disclosed statements made by a witness in the Grand Jury pursuant to its disclosure obligations. The Government, however, is not required to produce all of the Grand Jury minutes in this matter because the defendants have failed to provide specific factual allegations of government misconduct. The defendants virtually concede this, and merely urge that the Government's disclosures "raise serious questions" concerning conduct before the Grand Jury. (BOP Mem., at 24.) Even assuming the truth of that premise, raising "questions" fails to meet the defendants' burden. *See also United States v. Goff*, No. 15-CR-616 (KBF), 2016 WL 3264129, at *4 (S.D.N.Y. June 13, 2016) ("[A] court may not review grand jury minutes 'without concrete allegations of Government misconduct . . . .'" (quoting *Leung*, 40 F.3d at 582)).

Nor is it accurate that the Government's disclosures raise questions about its conduct before the Grand Jury. The Government's disclosures are meant to convey information in its possession that may be helpful to the defense. The Government is not required to convey to the Grand Jury the defendant's views of the evidence, its theories, or even the personal opinions of a victim's attorney. *See United States v. Stein*, 429 F. Supp. 2d 633, 640 (S.D.N.Y. 2006) ("[T]he Supreme Court has explained, prosecutors are not required to present exculpatory evidence to the grand jury." (citing *United States v. Williams*, 504 U.S. 36, 52, (1992))). Here, the Government went beyond what it must do and, prior to returning the operative Indictment, the Grand Jury was informed that the Plan took "no position" on its status a victim in this case. If anything, the Government's decision to provide the Grand Jury that information, along with the volume of

45

disclosures made to the defendants in this case, demonstrate the Government has taken its obligations seriously and acted with care.

The defendants' speculations aside, there are no specific allegations that the Government's conduct before the Grand Jury was improper, let alone that there is a basis to dismiss the Indictment. *See United States v. Brown*, No. 95 CR. 168 (AGS), 1995 WL 387698, at *7 (S.D.N.Y. June 30, 1996) ("[A] defendant's mere speculation as to what occurred in front of the grand jury does not warrant inspection of the minutes, either by disclosure to defense counsel or through *in camera* inspection by the Court." (citations omitted)); *see also United States v. Trochelmann,* No. 98 CR. 1276, 1999 WL 294992, at *3 (S.D.N.Y. May 11, 1999) ("Allegations based on belief, such as Defendants' allegations here, provide no reason to disregard the presumption of regularity of grand jury proceedings, and do not even warrant an in camera review of the grand jury minutes." (citation and internal quotations omitted)). Accordingly, the motion for production of Grand Jury minutes should be denied.

## CONCLUSION

For the reasons set forth above, the defendants' motions should be denied in their entirety.

Dated: New York, New York
October 21, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


By:  /s/
Ryan B. Finkel
Daniel G. Nessim
Assistant United States Attorneys
Tel.: 212-637-6612 / -2486

46